[No. A131049. First Dist., Div. Four. Mar. 15, 2012.]

CALIFORNIA SOCIETY OF ANESTHESIOLOGISTS et al., Plaintiffs and Appellants, v.
EDMUND G. BROWN, JR., as Governor, etc., Defendant and Respondent;
CALIFORNIA ASSOCIATION OF NURSE ANESTHETISTS, Intervener and Respondent.

**COUNSEL**

Cole Pedroza, Curtis A. Cole, Matthew S. Levinson; Hassard Bonnington, Philip S. Ward and B. Thomas French for Plaintiff and Appellant California Society of Anesthesiologists.

Francisco J. Silva and Long X. Do for Plaintiff and Appellant California Medical Association.

Astrid G. Meghrigian for San Diego Center for Patient Safety as Amicus Curiae on behalf of Plaintiffs and Appellants.

Pacific West Law Group and Gregory Abrams for American Medical Association and American Society of Anesthesiologists as Amici Curiae on behalf of Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, Jennifer M. Kim, Acting Assistant Attorney General, Karin S. Schwartz, Susan M. Carson and Jennifer A. Bunshoft, Deputy Attorneys General, for Defendant and Respondent.

Mayer Brown, Philip R. Recht, Andrew T. Kugler and Donald M. Falk for Intervener and Respondent.

Nossaman and Ann O'Connell for California Hospital Association as Amicus Curiae on behalf of Defendant and Respondent and Intervener and Respondent.

**OPINION**

**RUVOLO, P. J.—**

## I.

### INTRODUCTION

In order for hospitals, ambulatory surgical centers, and critical access hospitals to receive reimbursement under Medicare when a certified registered nurse anesthetist (CRNA) administers anesthesia, federal regulations

require that the CRNA must be supervised by a physician. (42 C.F.R. §§ 482.52(a)(4) (2011), 416.42(b)(2) (2011), 485.639(c)(2) (2011).) However, other federal regulations provide that a state's governor has the discretion to make a request on behalf of the state to opt out of the physician supervision requirement after concluding, among other things, that the opt out is "consistent with State law." (42 C.F.R. §§ 482.52(c)(1) (2011), 416.42(c)(1) (2011), 485.639(e)(1) (2011).) On June 10, 2009, former Governor Arnold Schwarzenegger (the Governor) exercised his discretion under federal law and opted California out of the federal physician supervision Medicare reimbursement requirement.[1]

Eight months later, the California Society of Anesthesiologists and the California Medical Association (collectively, appellants) filed a petition for writ of mandate and request for declaratory relief contending that the Governor "acted contrary to California laws that prohibit CRNAs from administering anesthesia without physician supervision." Appellants requested that a writ of mandate issue "commanding [the Governor] to withdraw the 'opt-out' letter" and for the trial court to declare that "opting-out of the requirement that CRNAs be supervised by physicians was not and is not consistent with California law." Appellants' writ petition was followed by a motion for summary judgment making the same arguments.

The trial court declined to issue a writ of mandate or to grant appellants' motion for summary judgment, concluding that the Governor did not abuse his discretion in determining that the opt out was consistent with state law. As the trial court recognized, the controlling statutory provision on the scope of practice of CRNA's in California does not require them to administer anesthesia under physician supervision. Instead, it permits CRNA's to administer anesthesia "ordered by" a physician. (Bus. & Prof. Code, § 2725, subd. (b)(2).)[2] We agree that the plain meaning of section 2725, subdivision (b)(2) does not require physician supervision of CRNA's. (§ 2725, subd. (e).) Consequently, we affirm the trial court's judgment.

## II.

## FACTS AND PROCEDURAL HISTORY

This case presents no material issues of disputed fact. Fundamentally, it involves the scope of practice of CRNA's in California. CRNA's are both registered nurses and anesthesia specialists. In order to be certified as

---

[1] In this appeal, California's current governor, Edmund G. Brown, Jr., is defending his predecessor's opt-out decision.

[2] All further undesignated statutory references are to the Business and Professions Code.

CRNA's, they must complete an undergraduate degree in nursing and have two to three years of postgraduate education, including hundreds of hours of clinical work, and "the performance of direct patient care by completing cases encompassing a wide variety of anesthesia experiences." In addition, CRNA's must pass a national certification exam, and complete a continuing education program every two years.

In the underlying litigation, undisputed evidence has been presented that in many California medical facilities, especially in rural and underserved areas, CRNA's have been routinely administering anesthesia for decades pursuant to a physician order but without physician supervision. Their function is described as follows: "Typically, a surgeon (who is responsible for directing the patient's care) orders the anesthesia. On receiving that order, the anesthesia provider, whether CRNA or anesthesiologist, performs the pre-anesthesia evaluation, administers the anesthetic to the patient, monitors the patient's reaction during surgery, and conducts the post-anesthesia evaluation after the patient recovers. . . ." The record does not reflect that any disciplinary action has ever been taken against a CRNA for administering anesthesia without physician supervision.

The current dispute arises from the Governor's decision to opt out of three related federal Medicare regulations that require physician supervision of CRNA's as a condition of Medicare reimbursements. The first regulation applies only to hospitals, and requires CRNA's to administer anesthesia "under the supervision of the operating practitioner or of an anesthesiologist who is immediately available if needed." (42 C.F.R. § 482.52(a)(4) (2011).) The second and third regulations, applicable only to critical access hospitals and ambulatory surgery centers, require supervision by the operating physician or practitioner. (42 C.F.R. §§ 485.639(c)(2) (2011), 416.42(b)(2) (2011).)

Despite these requirements, another Medicare regulation provides that a state can opt out of these three federal regulations requiring physician supervision, thus enabling hospitals and surgery centers to remain eligible for Medicare reimbursements. To opt out of the physician supervision requirement, the state's governor must submit a letter to the Centers for Medicare and Medicaid Services[3] requesting an exemption. The letter "must attest" that the governor has (1) consulted with state boards of medicine and nursing about issues related to access to and the quality of anesthesia services in the

---

[3] The Centers for Medicare and Medicaid Services is the federal agency within the United States Department of Health and Human Services that is responsible for administering the Medicare Program.

State; (2) concluded that it is in the "best interests of the State's citizens" to opt out of the current federal physician supervision requirement; and (3) concluded that the opt out is "consistent with State law." (42 C.F.R. §§ 482.52(c)(1) (2011), 485.639(e)(1) (2011), 416.42(c)(1) (2011).) The governor's request to opt out may be submitted or withdrawn at any time. It is "effective upon submission." (42 C.F.R. §§ 482.52(c)(2) (2011), 416.42(c)(2) (2011), 485.639(e)(2) (2011).)

California's governor determined that all three of the federal requirements had been met after reviewing information pertaining to the use of CRNA's in California medical facilities, responses from California's Board of Registered Nursing and Medical Board of California, and letters from numerous hospital executives, administrators, and surgeons. Eventually, the Governor sent a letter to the Centers for Medicare and Medicaid Services on June 10, 2009, stating, "Having consulted with the California Board of Medicine and California Board of Registered Nursing and having determined that this exemption is consistent with state law, I have concluded that it is in the interests of the people of California to opt out of this requirement." As set forth in the federal regulations, the Governor's request was granted upon submission. At this point, California was the 15th state to opt out of the federal CRNA physician supervision requirement.[4]

It is important at the outset to clarify the practical effect of the Governor's decision to opt out of the federal supervision requirement. Notably, appellants repeatedly make sweeping claims, such as the Governor "eliminated the physician supervision requirement from California law" by issuing the opt out, and that "[t]he effect of the decision, at least for purposes of those physicians, nurse anesthetists, patients, and hospitals that look to Medicare for reimbursement, will be to eliminate physician supervision of anesthesia services." In reality, the result of the opt out is that California hospitals, critical access hospitals, and ambulatory surgery centers are exempted from federal rules making physician supervision a prerequisite for Medicare reimbursements. Whether physicians should supervise CRNA's, or whether CRNA's should be used at all, are questions that have to be decided by each individual medical facility because "hospitals can always exercise stricter standards than required by State law." (66 Fed.Reg. 56762, 56765 (Nov. 13, 2001).) Accordingly, a hospital or other medical facility may require physician supervision of CRNA's if it deems it appropriate, irrespective of the state's opt out.[5] The Governor's opt-out decision merely gives California

---

[4] The other states were Washington, Oregon, Iowa, Nebraska, Idaho, Minnesota, New Hampshire, New Mexico, Kansas, North Dakota, Alaska, Montana, South Dakota and Wisconsin. Colorado later became the 16th state to opt out.

[5] At the oral argument conducted below, counsel for intervener California Association of Nurse Anesthetists reported that "in the marketplace today, I can tell you that since the opt-out

facilities the option of using CRNA's to administer anesthesia without physician supervision without jeopardizing their Medicare reimbursements.

On February 2, 2010, following the Governor's refusal to rescind the opt-out letter, appellants filed the present case seeking a writ of mandate directing the Governor to withdraw the opt out as inconsistent with California law. Appellants also sought a general declaration that California law requires CRNA's to administer anesthesia under physician supervision. After the California Association of Nurse Anesthetists was allowed to intervene, the parties filed cross-motions for summary judgment.

On December 23, 2010, the superior court issued an order denying appellants' writ petition and motion for summary judgment, and granting summary judgment for the Governor and the California Association of Nurse Anesthetists (collectively, respondents). The court's written decision began by observing that the "only actual conduct challenged by [appellants] is . . . the Governor's attestation to CMS [(Centers for Medicare and Medicaid Services)] that the opt-out is consistent with California law." The court emphasized that appellants' writ petition and motion for summary judgment did not challenge the other two attestations made by the Governor; namely, that he had (1) consulted with the Medical Board of California and Board of Registered Nursing, and (2) determined that the opt out was in the best interests of the state's citizens.

The trial court denied all of appellants' requested relief, observing that the federal government structured the federal opt-out rules to "assign[] the question of whether the opt-out is consistent with state law to the Governor's discretion, whom CMS [(Centers for Medicare and Medicaid Services)] viewed as 'best suited' to make that determination." Thus, the court determined that it "must respect that structure" and not disturb the Governor's "judgment absent a showing that his reading of California law was an abuse of discretion."

Applying the deferential standard of review appropriate in a mandamus action challenging an official's discretionary decision, the trial court concluded that "the Governor's attestation to CMS [(Centers for Medicare and Medicaid Services)] that the opt-out is consistent with California law was not so palpably unreasonable and arbitrary as to constitute an abuse of discretion." In addition, the court found "on independent review that the Governor's attestation was, in fact, accurate because it was consistent with the

decision was made . . . , any number of facilities have eliminated supervision requirements, and any number of facilities have maintained them."

language and structure of the controlling statute, the legislative history, other extrinsic evidence, and prior cases and [Attorney General] opinions." The trial court also denied appellants' request for declaratory relief, finding that "[w]ithout the mandamus cause of action, the declaratory relief claim would not be available to [appellants]." Accordingly, the trial court entered judgment in favor of respondents. Appellants timely appealed.[6]

## III.

## DISCUSSION

### A. *Standard of Review*

We review the trial court's ruling on the parties' cross-motions for summary judgment de novo. (*Reliance Nat. Indemnity Co. v. General Star Indemnity Co.* (1999) 72 Cal.App.4th 1063, 1074 [85 Cal.Rptr.2d 627].) In doing so, we exercise " 'an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court . . . .' [Citations.]" (*Campanano v. California Medical Center* (1995) 38 Cal.App.4th 1322, 1327 [45 Cal.Rptr.2d 606].) In this case, the trial court indicated it "must respect [the] structure" of the federal scheme and that it would "not disturb the Governor's judgment absent a showing that his reading of California law was an abuse of discretion."

Appellants argue that we should impose a stricter standard because this case involves a pure question of law on undisputed facts. However, we agree with the trial court that our review is limited to determining whether the Governor abused his discretion in concluding that the opt out of the federal supervision requirement is consistent with state law. Instead of prescribing specific legal standards that must be met, the Centers for Medicare and Medicaid Services deliberately chose to give state governors the sole discretion to determine whether the removal of physician supervision is "consistent with" state law. (66 Fed.Reg., *supra*, 56762, 56764.) In doing so, it rejected proposed language that would have required the Governor to attest that the opt out is consistent " 'with all relevant State laws.' " (*Ibid.*)

The Centers for Medicare and Medicaid Services explicitly stated: "We recognize there is a difference of opinion of those parties on both sides of this issue, regarding what State law is, but we believe the *governors are best*

---

[6] On February 1, 2011, appellants filed a petition for extraordinary relief in this court pursuant to Code of Civil Procedure section 437c, subdivision (m), challenging the denial of their motion for summary judgment. (*California Society of Anesthesiologists v. Superior Court* (Feb. 3, 2011, A131037) [order].) This court summarily denied the petition, explaining that "Petitioners have an adequate remedy at law by appeal from the judgment." (*Ibid.*)

*suited to make determinations in this area.*" (66 Fed.Reg., *supra*, 56762, 56764, italics added.) In so finding, the Centers for Medicare and Medicaid Services rejected requests that it issue more specific standards and provide "procedural safeguards to ensure that the State governors, in their exercise of their discretion, would observe existing State laws in regards to physician supervision." (*Id.*, 56765.) For example, it rejected a proposal that governors seek written opinions from state attorneys general on whether the opt out was "consistent with State law." (*Ibid.*) It emphasized that "[w]e purposefully were not prescriptive in detailing the processes or steps that should be undertaken" in making this determination; and that the "overarching principle is that the governor has the authority to act according to his or her assessment of the needs and safety of the citizens of that particular State." (*Id.*, 56766.)

The federal deference towards a governor's decision to opt out is further reflected in the fact that the "opt out" is "effective upon submission." (42 C.F.R. §§ 482.52(c)(2) (2011), 416.42(c)(2) (2011), 485.639(e)(2) (2011).) Thus, "[t]he governor's letter to the Administrator of CMS [(Centers for Medicare and Medicaid Services)] will be accepted on face value, with no independent CMS scrutiny or analysis of the governor['s] underlying rationale." (66 Fed.Reg., *supra*, 56762, 56766.)

Given this federal framework, which clearly entitles the Governor to come to a decision with virtually no administrative oversight or legal interference, we believe the Governor's conclusion that the opt out is consistent with California law is entitled to deference, requiring reversal only upon a finding that the Governor acted "in a palpably unreasonable and arbitrary manner as to indicate an abuse of discretion as a matter of law." (*California Teachers Assn. v. Ingwerson* (1996) 46 Cal.App.4th 860, 867 [53 Cal.Rptr.2d 917].) While highly deferential, we emphasize that the Governor is not given unfettered discretion in determining that the opt out is consistent with state law. Like the trial court, we follow the general rules for reviewing discretionary decisions by a writ of mandamus.

■ "Although traditional mandamus will not lie to control the discretion of a public official or agency, that is, to force the exercise of discretion in a particular manner, ' ". . . [it] will lie to correct abuses of discretion, and will lie to force a particular action by the . . . officer, when the law clearly establishes the petitioner's right to such action." ' [Citations.]" (*Miller Family Home, Inc. v. Department of Social Services* (1997) 57 Cal.App.4th 488, 491 [67 Cal.Rptr.2d 171].) Consequently, while the Governor is not entitled to ignore a well-settled body of law requiring physician supervision of CRNA's,

to the extent that the law in California is susceptible to more than one legally tenable interpretation, we must give deference to the Governor's conclusion that the opt out is consistent with California law.

### B. *California Statutes Governing Physician Supervision of CRNA's*

■ In this appeal appellants contend that the Governor abused his discretion when he attested to the Centers for Medicare and Medicaid Services that the removal of the federal physician supervision requirement for CRNA's administration of anesthesia in California was consistent with state law.[7] Neither in the trial court nor on appeal have appellants challenged the other attestations made by the Governor—including that the opt out was in the best interests of the state's citizens. Consequently, we need not and do not address concerns raised by amicus curiae about patient safety if CRNA's administer anesthesia without physician supervision. As our Supreme Court emphasized in *Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1047, footnote 12 [56 Cal.Rptr.3d 814, 155 P.3d 226], amicus curiae " 'accepts the case as he finds it.' "

Therefore, turning to the question of whether the Governor correctly interpreted California state law, we begin by noting that two separate, but complementary, statutory schemes are relevant to the question of whether CRNA's are authorized to administer anesthesia to patients without physician supervision. The first statutory scheme is the Nurse Anesthetists Act (§ 2825 et seq.) which, in 1983, expressly recognized the specialty practice of CRNA's. The second statutory scheme is the Nursing Practice Act (§ 2700 et seq.), which contains the express statutory authorization for CRNA's to administer anesthesia.

■ The Nurse Anesthetists Act defines a "nurse anesthetist" as "a person who is a registered nurse, licensed by the board and who has met standards for certification from the board." (§ 2826, subd. (a).) It further provides that "[t]he utilization of a nurse anesthetist to provide anesthesia services in an acute care facility shall be approved by the acute care facility administration

---

[7] This question is of substantial interest to the medical community, and we have received numerous briefs to assist us in deciding this appeal. Specifically, we have granted permission for the American Medical Association and the American Society of Anesthesiologists to file an amicus curiae brief in support of appellants. The San Diego Center for Patient Safety has also been allowed to file an amicus curiae brief in support of appellants. Intervener/respondent California Association of Nurse Anesthetists has filed a separate brief in this appeal. The California Hospital Association has been granted permission to file an amicus curiae brief in support of respondents.

and the appropriate committee, and at the discretion of the physician, dentist or podiatrist." (§ 2827.) Despite appellants' contentions to the contrary, the fact that the physician may participate in the initial decision whether to use a CRNA to provide anesthesia care does not answer the question of whether the CRNA must be supervised by a physician once the initial decision has been made.

The Nurse Anesthetists Act clarifies that it is "not intended to address the scope of practice" of CRNA's (§ 2833.6), but confirms that "[n]othing in this article shall be construed to limit a certified nurse anesthetist's ability to practice nursing." (§ 2833.3.) Recognizing that CRNA's administer anesthesia under the authority of their own licenses as independent practitioners, the Nurse Anesthetists Act also provides that CRNA's "shall be responsible for [their] own professional conduct and may be held liable for those professional acts." (§ 2828.)

■ It is the Nursing Practice Act that gives CRNA's legal authority to administer anesthesia after a physician orders a course of treatment that includes anesthesia. Section 2725 of the Nursing Practice Act was amended during the 1973–1974 legislative session of the California Legislature to expand the scope of practice for nurses. It emphasizes that "nursing is a dynamic field, the practice of which is *continually evolving to include more sophisticated patient care activities.*" (§ 2725, subd. (a), italics added). The Legislature enacted into law its "intent . . . to provide *clear legal authority* for functions and procedures that have common acceptance and usage," and to "permit additional sharing of functions within organized health care systems" of "*overlapping functions* between physicians and registered nurses." (*Ibid.,* italics added.)

Significantly, in 2003 the Legislature further amended section 2725 to clarify that the Board of Registered Nursing is the *sole* agency that may define or interpret the practice of nursing for those licensed pursuant to the Nursing Practice Act, which includes CRNA's. This legislative directive provides that "[n]o state agency other than the [B]oard [of Registered Nursing] may define or interpret the practice of nursing" unless specifically authorized by the Nursing Practice Act or another state or federal statute. (§ 2725, subd. (e).)

■ As registered nurses, CRNA's scope of practice necessarily rests on the authority provided in section 2725, subdivision (b) of the Nursing Practice Act, which defines the "practice of nursing." The subdivision defines four broad, and different, nursing "functions" that come within the practice of nursing. (§ 2725, subd. (b).) Such functions consist of those tasks that, among other things, "require a substantial amount of scientific knowledge or technical skill." (*Ibid.*) Section 2725, subdivision (b)(2) provides the statutory

authority for CRNA's to administer anesthesia when ordered by a physician because it lists, as one of the nursing functions: "Direct and indirect patient care services, including, but not limited to, the administration of medications and therapeutic agents, necessary to implement a treatment, disease prevention, or rehabilitative regimen *ordered by* and within the scope of licensure of a physician, dentist, podiatrist, or clinical psychologist . . . ."[8] (Italics added.) Consequently, as the trial court realized, the question of whether California law requires CRNA's to administer anesthesia under physician supervision is "governed" by section 2725, subdivision (b)(2), and its proper interpretation is the key to resolving this case.

The plain language of section 2725, subdivision (b)(2) authorizes CRNA's to administer medications (including anesthesia) necessary to implement a treatment "ordered" by a physician. It does not say—and it has never said—that anything more than a physician's order is required. While the Nursing Practice Act does not define the term "order," we find guidance in a definition provided by the Pharmacy Law. (§ 4000 et seq.) "An 'order,' entered on the chart or medical record of a patient registered in a hospital or a patient under emergency treatment in the hospital, by or on the order of a practitioner authorized by law to prescribe drugs [(i.e., a physician)], shall be authorization for the administration of the drug . . . ." (§ 4019.) There is nothing in the Nursing Practice Act to indicate a different meaning of the term "order" is intended in that statutory scheme. It is a general rule of statutory construction to construe words or phrases in one statute in the same sense as they are used in a closely related statute pertaining to the same subject. (*In re Do Kyung K.* (2001) 88 Cal.App.4th 583, 589 [106 Cal.Rptr.2d 31]; *Estate of Hoertkorn* (1979) 88 Cal.App.3d 461, 465–466 [151 Cal.Rptr. 806].) Thus, there is no support in the statutory language that the requirement that a physician "order" the anesthesia also means that he or she must also "supervise" the CRNA's administration of anesthesia.

This same conclusion has been reached by the California Attorney General who has opined that "a registered nurse may lawfully administer an anesthetic, general or regional, under the authority of subdivision (b) of section 2725 when a physician . . . orders such nurse to administer the same to a particular patient." (67 Ops.Cal.Atty.Gen. 122, 139 (1984), fn. omitted.)

Contorting the statutory language, appellants argue section 2725, subdivision (b)(2) contains a supervision requirement, not because it says nurses must be supervised when administering "medications [or] therapeutic agents," but because it requires a physician's "order." Appellants claim that a physician's order constitutes some form of "instruction and direction," and that an

---

[8] For the sake of brevity, we will not continue to repeat section 2725, subdivision (b)(2)'s reference to "dentist, podiatrist, or clinical psychologist," but will just refer to physicians.

"instruction and direction" in turn constitutes "supervision." If we accepted that argument, this court would violate basic rules of statutory construction by ignoring the plain language of section 2725, subdivision (b)(2), and by inserting words that do not appear in the statutory text.

■ Additionally, appellants' argument that "order" means the same thing as "supervise" is not only strained on its face, but it also violates the " 'well recognized principle of statutory construction that when the Legislature has carefully employed a term in one place and has excluded it in another, it should not be implied where excluded.' [Citations.]" (*Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 725 [257 Cal.Rptr. 708, 771 P.2d 406]; see *In re Marriage of Hobdy* (2004) 123 Cal.App.4th 360, 366 [20 Cal.Rptr.3d 104]; *Cornette v. Department of Transportation* (2001) 26 Cal.4th 63 73 [109 Cal.Rptr.2d 1, 26 P.3d 332]; *Craven v. Crout* (1985) 163 Cal.App.3d 779, 783 [209 Cal.Rptr. 649] ["Where a statute referring to one subject contains a critical word or phrase, omission of that word or phrase from a similar statute on the same subject generally shows a different legislative intent."].)

In enacting section 2725, subdivision (b)(2), if the Legislature had intended to restrict a nurse's ability to administer medications or therapeutic agents by making it subject to a physician supervision requirement, it could have easily so provided, as it has in so many other statutes. For example, physician assistants are permitted to "administer or provide medication to a patient" only "while under the *supervision* of a licensed physician." (§ 3502.1, subd. (a), italics added). Likewise, section 2746.51, subdivision (a)(4) states that the "furnishing or ordering of drugs or devices by a certified nurse-midwife occurs under physician and surgeon *supervision*." (Italics added.) Using similar wording, section 2836.1, subdivision (d) provides that the "furnishing or ordering of drugs or devices by a nurse practitioner occurs under physician and surgeon *supervision*." (Italics added.)

■ We believe that if the Legislature had intended to impose a supervision requirement in section 2725, subdivision (b)(2), it surely would have expressed such intent more explicitly—just as it has done in other statutes governing the administration of medication. " 'While every word of a statute must be presumed to have been used for a purpose, it is also the case that every word excluded from a statute must be presumed to have been excluded for a purpose.' " (*Arden Carmichael, Inc. v. County of Sacramento* (2001) 93 Cal.App.4th 507, 516 [113 Cal.Rptr.2d 248], fn. omitted.)[9]

---

[9] Respondents also point out that on three separate occasions, the Legislature has failed to pass bills that would explicitly require a physician to be present to supervise CRNA's administering anesthesia. However, our Supreme Court has repeatedly cautioned that "[u]npassed bills, as evidences of legislative intent, have little value. [Citations.]" (*Dyna-Med, Inc. v.*

C. *Administrative Interpretation Confirming That CRNA's Are Not Required to Administer Anesthesia Under Physician Supervision*

While realizing that we must take " ' "final responsibility" ' " for the construction of section 2725, subdivision (b)(2) (*Lazarin v. Superior Court* (2010) 188 Cal.App.4th 1560, 1569–1570 [116 Cal.Rptr.3d 596]), we also note that the Board of Registered Nursing, which is the *sole* agency authorized by the Legislature to define or interpret the practice of nursing for those licensed pursuant to the Nursing Practice Act, has repeatedly expressed its view that physician supervision of CRNA's is not required. Our Supreme Court has held that the amount of deference to be afforded to an agency's interpretation of a statute is "contextual," and must be considered in light of the agency's expertise and technical knowledge, its thorough analysis of the issues, and its consistency over time. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7, 10, 14–15 [78 Cal.Rptr.2d 1, 960 P.2d 1031] (*Yamaha Corp*).) Viewed against the standard set out in *Yamaha Corp.*, the Board of Registered Nursing's interpretation of section 2725, subdivision (b)(2), which is a statute at the core of their technical expertise and knowledge, supports our plain meaning construction and is accorded " 'great weight and respect.' . . . [Citations.]" (*Yamaha Corp., supra*, at p. 12.)

Similarly, the State Department of Health Care Services has also concluded that a supervision requirement is inconsistent with the Nursing Practice Act. In 1987, it amended a Medi-Cal program regulation to eliminate the requirement that nurse anesthetists be supervised by a physician as a condition of coverage under the Medi-Cal program. (Cal. Code Regs., tit. 22, § 51326.) In its statement of reasons for making the change, the State Department of Health Care Services made it clear that supervision of CRNA's is "inconsistent with the Business and Professions Code," and is not required by California law.

We also find the Attorney General's seminal 1984 opinion persuasive. The precise issue the Attorney General was asked to address was whether a CRNA could provide anesthesia pursuant to a protocol established by a "standardized procedure," as opposed to a treatment regimen ordered by a physician for a specific patient. (67 Ops.Cal.Atty.Gen., *supra*, at p. 123.) The opinion contains an informative discussion on the CRNA scope of practice and also discusses several Supreme Court cases relied upon by appellants to support their assertion that the Governor's opt-out decision was contrary to California law. The Attorney General concluded that, while a

---

*Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1396 [241 Cal.Rptr. 67, 743 P.2d 1323]; accord, *Lolley v. Campbell* (2002) 28 Cal.4th 367, 378–379 [121 Cal.Rptr.2d 571, 48 P.3d 1128]; *Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 927 [44 Cal.Rptr.3d 223, 135 P.3d 637].)

CRNA could not lawfully administer an anesthetic under standardized procedures, a CRNA was legally authorized by section 2725, subdivision (b)(2) to administer all forms of anesthesia on the sole condition that the anesthesia be "ordered" by a physician acting within the scope of his or her license. (67 Ops.Cal.Atty.Gen., *supra*, at p. 123.)

While choosing regrettably stereotypical pronouns, the Attorney General discussed the relationship between physicians and nurses as follows: " 'A physician must ascertain the relevant facts about a patient to enable him to make a diagnosis and provide a course of treatment, and this must be done on an individualized patient basis. [Citations.] A physician cannot delegate to a nurse his authority to diagnose and to direct a course of treatment that he deems appropriate although he may utilize the services of others to help him ascertain the facts and *to carry out his ordered treatment.*' " (67 Ops.Cal.Atty.Gen., *supra*, at p. 141, italics added.) While stressing that the physician still retains ultimate responsibility for the patient's care, the Attorney General refrained from expressing or implying any supervision requirement, indicating "[t]his does not mean that the physician responsible for the patient's surgery *may not direct the nurse anesthetist by means of some written instructions.*" (*Id.* at p. 140, italics added.)

In reaching this conclusion, the Attorney General "disapproved" an earlier opinion of its office—56 Ops.Cal.Atty.Gen. 1 (1972)—which had held that CRNA's could only administer general anesthesia when supervised by a licensed physician or dentist. (67 Ops.Cal.Atty.Gen., *supra*, at pp. 127–128, 140.) The Attorney General noted that its 1972 opinion relied on language contained in *Chalmers-Francis v. Nelson* (1936) 6 Cal.2d 402 [57 P.2d 1312] (*Chalmers-Francis*) and *Magit v. Board of Medical Examiners* (1961) 57 Cal.2d 74 [17 Cal.Rptr. 488, 366 P.2d 816] (*Magit*)—cases which are relied upon by appellants in this appeal to support their assertion that physician supervision of CRNA's is required by California law. (67 Ops.Cal.Atty.Gen., *supra*, at pp. 127–128.) The Attorney General noted that *Chalmers-Francis* and *Magit* were decided before the Legislature extensively amended section 2725 in 1974 to broaden the scope of nursing practice, recognize overlapping functions between physicians and nurses, and accommodate the continuing evolution of nursing practice. (§ 2725, subd. (a).) Significantly the Attorney General believed that "the revision of section 2725 in 1974 effectively overrules our 1972 opinion . . . ." (67 Ops.Cal.Atty.Gen., *supra*, at p. 139.)

D.  *Appellants' Attempt to Show the Opt Out Was Inconsistent with California Law*

Like the issue that was decided in the 1984 Attorney General opinion, this is a straightforward case of statutory interpretation. This court has recognized

that the scope of practice for CRNA's derives from section 2725, subdivision (b)(2), from which the word "supervision" is notably absent. Consequently, the authorities cited by appellants that predate the 1974 amendments to section 2725 (*Chalmers-Francis, supra*, 6 Cal.2d 402; *Magit, supra*, 57 Cal.2d 74) or that do not involve any of the functions authorized by section 2725, subdivisions (a)–(d), have little persuasive value. (See, e.g., 66 Ops.Cal.Atty.Gen. 427, 431–432 (1983) [opinion recognized the challenged function, injecting contrast materials into patients for diagnostic studies, was not described by any of "the four expressly stated areas of activity permitted the registered nurse"].)

In the end, there are only a few authorities cited by appellants that squarely address the issue before us. Appellants rely on a November 6, 2009 Legislative Counsel opinion, written after the Governor made the challenged opt-out decision, which concludes that "[s]tate law does not authorize a certified registered nurse anesthetist to perform anesthesia services without supervision by a physician." Our Supreme Court has indicated that, "like any such opinion—even that of an appellate court," a Legislative Counsel's opinion "is only as persuasive as its reasoning." (*Grupe Development Co. v. Superior Court* (1993) 4 Cal.4th 911, 922 [16 Cal.Rptr.2d 226, 844 P.2d 545].) We find the Legislative Counsel's interpretation to be incorrect in light of the unambiguous language of section 2725, subdivision (b)(2), which the Legislative Counsel refers to but fails to analyze. (*State ex rel. Harris v. PricewaterhouseCoopers, LLP* (2006) 39 Cal.4th 1220, 1233, fn. 9 [48 Cal.Rptr.3d 144, 141 P.3d 256] ["the Legislative Counsel's declarations are not binding or persuasive where contravened by the statutory language, and by other indicia of a contrary legislative intent"].)

Appellants also rely on a federal antitrust case, *Bhan v. NME Hospitals, Inc.* (9th Cir. 1985) 772 F.2d 1467. In *Bhan*, the court held that nurse anesthetists and anesthesiologists competed in the same market even though "[u]nder California law, in administering anesthesia a nurse must act at the direction of, and under the supervision of, *inter alia*, a physician. [Citations.]" (*Id.* at p. 1471.) In support of this assertion, the court cited several outdated provisions of California law and a State Department of Health Services regulation that has been amended to remove the reference to a physician supervision requirement as inconsistent with California law. (*Ibid.*) We conclude this Ninth Circuit opinion is unpersuasive on the issue before us. (*Graham v. Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 830 [171 Cal.Rptr. 604, 623 P.2d 165] [state court not required to follow federal lower court precedents which it finds unpersuasive].)

As a final observation, while appellants, joined by amicus curiae, vehemently contend that the Governor's opt-out decision was made in

contravention of the laws relating to the practice of medicine by physicians, it is clear that those laws are not intended to, and do not, limit the scope of practice of other licensed health care professionals, such as CRNA's. Section 2061 of the Medical Practice Act (§ 2000 et seq.) states: "Nothing in this chapter [(medicine)] shall be construed as limiting the practice of other persons licensed, certified, or registered under any other provision of law relating to the healing arts when such person is engaged in his or her authorized and licensed practice."

As nursing becomes more specialized, many nursing functions will inevitably overlap with physician functions. (§ 2725, subd. (a).) That does not mean, however, that those functions are not legitimately part of the practice of nursing. If appellants remain concerned that a physician's practical, ethical and legal responsibilities for his or her patient's care will be jeopardized by the use of unsupervised CRNA's to administer anesthesia, the solution lies with the Legislature, not this court. (See *Community Redevelopment Agency v. Abrams* (1975) 15 Cal.3d 813, 832 [126 Cal.Rptr. 473, 543 P.2d 905] [in resolving "difficult and involved questions of social policy . . . wisdom lies in the direction of judicial deference to the legislative branch"].)

E.   *Conclusion*

In the final analysis, in order for this court to find that the Governor abused his discretion in attesting that opting out of the federal Medicare physician supervision requirement was consistent with state law, we would have to ignore not just one, but *multiple* authoritative sources uniformly concluding that CRNA's are allowed to administer anesthesia in California without physician supervision. Specifically, the Nursing Practice Act, by express statutory language, allows CRNA's to administer anesthesia in California on a physician's order but without physician supervision. (§ 2725, subd. (b)(2).) This conclusion has also been reached on numerous occasions by the Board of Registered Nursing, the agency with expertise in CRNA scope of practice matters, and is consistent with the determination of other relevant state agencies and officials, including the Attorney General. The contrary authority cited by appellants to support a supervision requirement is insufficient to render the Governor's actions "palpably unreasonable and arbitrary" so as "to indicate an abuse of discretion as a matter of law." (*California Teachers Assn. v. Ingwerson, supra*, 46 Cal.App.4th at p. 867.) Consequently, the Governor's attestation to the Centers for Medicare and Medicaid Services that the opt out is consistent with California law did not constitute an abuse of discretion.

## IV.

## DISPOSITION

The judgment is affirmed.

Reardon, J., and Sepulveda, J.,[*] concurred.

Appellants' petition for review by the Supreme Court was denied June 13, 2012, S201990.

---

[*]Retired Associate Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.